### LEE v. HOUSTON ELECTRIC CO.

#### No. 3859.

Court of Civil Appeals of Texas. Beaumont.

May 8, 1941.

Rehearing Denied June 4, 1941.

Gammage, Gammage & Bauer, of Houston, for appellant.

Baker, Botts, Andrews & Wharton and J. C. Hutcheson, III, all of Houston, for appellee.

WALKER, Chief Justice.

On October 16, 1936, appellant, Arthur Lee, received personal injuries in a collision between his truck, which he was driving, and a street car belonging to and operated by appellee, Houston Electric Company, at the intersection of Michaux and Usener Streets, in the City of Houston. By the verdict of the jury, appellee was convicted of negligence proximately causing the collision. The issue of "discovered peril" was found in appellee's favor, and the jury found that the collision was not the result of an unavoidable accident. Appellant's damages were assessed as follows: To his truck $125, for doctor's bills, $175, and for his personal injuries $2,800. The jury convicted appellant of contributory negligence in the following respects: At the time of the collision he was operating his truck at an excessive rate of speed "under the circumstances"; he failed to keep "such a lookout as a person of ordinary prudence would have kept"; he failed to stop his truck before reaching the car tracks; he attempted to make a left turn in front of the street car "when there was not time and room for him to pass"; he suddenly speeded up his truck after slowing it down. On the verdict, judgment was entered that appellant "take nothing" and

that appellee "go hence without day." Appellant prosecuted his appeal to the Galveston Court of Civil Appeals; the case is on our docket by order of transfer by the Supreme Court.

Appellant assigns error that the court unlawfully communicated with the jury while it was deliberating on its verdict in this case, in violation of Articles 2195, 2197, and 2198, R.C.S.1925. In support of this assignment, appellant makes the following statement from the evidence on the motion for new trial.

The foreman of the jury testified:

"Q. While the jury was out did you receive any word or communication from the Court or through the Bailiff or Sheriff in charge of the jury? A. The only thing that I had was that the Judge, I believe, sent in for a report to see how near we were finished.

"Q. Who came in for that report? A. The Deputy Sheriff.

"Q. What did he say? A. He just said the Judge wanted to see our verdict—how near we were finished.

"Q. And then what did the Deputy Sheriff do? A. He just come and got it and brought it to the Judge, and then brought it back.

"Q. What did he say when he brought the papers back? A. He just said the Judge would give us a little more time.

Interrogated by the court, the foreman said:

"Q. Do you remember when I sent you and the Sheriff into the jury room that I told you laughingly that I had a free feed on that night? A. Yes, sir.

"Q. Are you able to repeat just what the Deputy Sheriff said to you when he sent in there? A. To the best of my recollection the Deputy Sheriff said 'Mr. Holmes, the Judge would like to find out how you are getting along and how near you are to a verdict', and I said, 'Okey', and I handed it to him and he came back and said, 'The Judge is willing to wait another 15 minutes' or something like that, 'or a little while longer'. I said, 'That is perfectly all right; tell the Judge I think we will be out of here in a very few minutes.'

"Q. You didn't have any idea I was going to lock you up all night, did you? A. Some of them did."

Juror Lacy testified:

"Q. Now, Mr. Lacy, can you tell me as near as you can just what the Bailiff said when he came in the jury room to see how you were getting along? A. He came in and asked how we stood about getting through with answering all the questions.

"Q. And then what did he do? A. Well, he taken our decisions—what we had up to that time and brought it into the Judge.

"Q. And then did he return it to you? A. Later, yes."

Juror Sweet testified:

"Q. Now then, Mr. Sweet, I'll ask you after the jury retired and went to the jury room to consider their verdict, did you receive any word or communication from the Court?

"Q. Didn't the Bailiff come into the jury room? A. Yes, sir.

"Q. What did he say, Mr. Sweet? A. He came in and said the Judge wanted to see those papers.

"Q. What papers? A. The papers the Judge gave us to make out our verdict on.

"Q. And did the jury give the papers to the Bailiff? A. Yes, sir.

"Q. Then what happened? A. That was about seven o'clock, and the Bailiff came back and said the Judge wished us to hurry up with it because he didn't want to stay too long; he wanted to leave.

"Q. And then when the papers were returned to you did the Bailiff have any other message? A. Nothing only that the Judge wanted us to hurry up as fast as we could, so we wouldn't be held over."

Bailiff Orme testified, answering questions by the court:

"A. I have tried to restrict any message to just what the Judge said, and it never amounted to anything except 'let me have your worksheet' or 'how far are you on it'.

"Q. Mr. Orme, my diary shows that this case went to the jury in the late afternoon and they got a verdict at six o'clock. It is a fact that I did ask you to get the worksheet from the jury. It is a fact that that night I delivered an address at Bellaire Girls School at the Commencement Exercises. It is a fact that I stated to the jury when they went to the jury room that I had that engagement, and that if they got a verdict I would hang around here until six o'clock, but I would have to leave around that time, and if they didn't get a verdict by that time they could be their

own bosses and select their time for adjournment and to come back the next day.

"Q. Do you remember you came back and the jury asked me to wait a few minutes because they thought they would have a verdict? A. That happened, Judge, * * *. It did happen about that time.

"A. * * * I know it didn't go beyond what the Judge told me to tell them, * * *."

The Court made the following statement:

"Court: I want to make this statement: I did send Mr. Orme into the jury room. I did make to the jury the statement that I have just made to Mr. Orme and the other witnesses. I sent him in to get the worksheet, and he brought it out and told me that the foreman stated that they thought in 15 minutes they would have a verdict, and I said I would be glad to wait that 15 minutes but I would have to be away by a little after six o'clock. That is what occurred as between me and the Bailiff. Of course, I don't know what he told them, but he came back in a few minutes, and we did wait and the verdict did come in—a little longer than 15 minutes, it was not less than 30 minutes from the time I communicated with the jury, and I think that was a little after five o'clock. I know it was after the Clerk usually leaves, and there was nobody here but some court attaches, and none of the attorneys for either party was present at the above occurrence or knew anything about it until after the verdict was rendered and the jury discharged."

We take the following statement from appellee's brief: "Defendant does not contend that it would be proper, ordinarily, for the trial judge, without notice to counsel of his intention to do so, and without all the jurors being assembled in open court, to examine the work papers of a jury which is in retirement and engaged in its deliberations on a case. In fact, defendant is at the present time attacking that very action in a case now pending before the Galveston Court of Civil Appeals. * * * The record establishes that at the close of the argument, in the presence of counsel for both parties, and when the jury was about to retire, the court turned to the jurors and stated that, while he was going out to dinner that evening, he would remain in court until six o'clock to receive a verdict if one was obtained and that if none was reached before that time

the jury could decide how late they wished to deliberate and return a sealed verdict if they reached an agreement that evening. These remarks were made orally and were, therefore, perhaps improper, in view of the strict construction of Articles 2197 and 2198 by the Supreme Court."

In Texas Midland R. R. Co. v. Byrd, 102 Tex. 263, 115 S.W. 1163, 20 L.R.A.,N.S., 429, 20 Ann.Cas. 137, our Supreme Court cited with approval Sargent v. Roberts, 1 Pick., Mass., 337, 11 Am.Dec. 185, where the following proposition is announced: "And we are all of opinion, after considering the question maturely, that no communication whatever ought to take place between the judge and the jury, after the cause had been committed to them by the charge of the judge, unless in open court, and, where practicable, in presence of the counsel in the cause."

The following authorities sustain this proposition as the law of this state: Smith v. Harris, Tex.Civ.App., 252 S.W. 836; Parker v. Bailey, Tex.Com.App., 15 S.W. 2d 1033; Gerneth v. Galbraith-Foxworth Lbr. Co., Tex.Com.App., 38 S.W.2d 775; Corn et al. v. Crosby County Cattle Co. et al., Tex.Com.App., 25 S.W.2d 290, Syl. 10; Lincoln v. Stone, Tex.Com.App., 59 S.W.2d 100; Clevenger v. Carl B. King Drilling Co., Tex.Civ.App., 62 S.W.2d 1001; Holman Bros. v. Cusenbary et al., Tex.Civ. App., 225 S.W. 65; Reynolds v. Sandel, Tex.Civ.App., 142 S.W.2d 527; Neely et al. v. Woolley, Tex.Civ.App., 143 S.W.2d 1015.

In answer to appellant's assignment that the court committed error, on the facts detailed above, in communicating with the jury, appellee advances the following propositions:

(a) "The record does not support plaintiff's claim that the trial judge, after examining the incomplete verdict, sent his bailiff to the jury room to ask the jury how much longer they would be engaged in their deliberations."

If it be conceded that the evidence does not support appellant's contention that the trial judge, after examining the incomplete verdict, sent his bailiff to the jury room to ask the jury how much longer they would be engaged in their deliberations, the concession would not render harmless the admitted fact that the court communicated with the jury in violation of Articles 2195, 2197, and 2198, R.C.S. 1925.

(b) "Since discovered peril was not raised by the evidence and plaintiff's own testimony convicted him of contributory negligence as a matter of law, defendant was entitled to an instructed verdict and all the errors assigned are immaterial."

These contentions are overruled. The issue of discovered peril was submitted to the jury without exception by appellee, nor did appellee at the close of the evidence ask for an instructed verdict.

■ The following statement from appellant's brief supports the submission by the court of the issue of discovered peril, and also the issues of appellant's contributory negligence: "Defendant states in its Brief that plaintiff does not claim the issues of discovered peril were raised by the testimony of his witnesses. We specifically deny such. Plaintiff does contend that the testimony of himself and his witnesses, in addition to the testimony of defendant's street car operator and defendant's other witnesses, clearly raises the issues of discovered peril in favor of plaintiff, and that by virtue thereof such issues were properly submitted to the jury. Defendant says that defendant's street car operator's testimony failed to show that plaintiff was in a position of peril and that the motorman so realized long enough before the collision so that he could, if he had applied his brakes, stopped the street car before it collided with plaintiff's truck. We refer this Honorable Court to the testimony of the operator of defendant's street car, and likewise the testimony of plaintiff. The operator, according to plaintiff's version, was five or six 50 ft. lots back down the street on Usener Street from the east edge of the intersection when plaintiff entered into the intersection and started across it. He testified further that he thought the street car was going at a reasonable rate of speed, less than 20 miles per hour, and that at such a speed he would have had plenty time to cross the track in front of it. He testified further that the operator did not ring his bell, indicating that he intended to continue and cross the intersection. He further testified that there are no obstructions right at the intersection. The exhibits and surveys introduced in evidence show that a person approaching the intersection from either side can see back down the other street 100 or 200 feet before he reaches the intersection. He further testified that the street car operator continued and came right on into him without slowing down, sounding his bell, or doing anything to attempt to avert the collision. The view was clear and unobstructed, and if plaintiff's version is correct, the street car operator just decided to let plaintiff get out of his way the best way he could without any help or assistance from him. Certainly this record clearly shows that if the operator had sounded his bell and even so much as slackened his speed, the accident would not have happened. The operator himself testified that he could have stopped within four or five feet as plaintiff's truck started up on the track, and as the street car started into the intersection. The plat in evidence showed clearly, and the operator testified, that had he then put on his brakes, the street car would have stopped before it got to the truck. The operator's version of the collision was that he was driving along slowly and carefully, ringing his bell and having his street car under control, that as he approached the intersection he looked to the right, north down Michaux, and saw the lights of plaintiff's truck 50 or 60 ft. back of the intersection. He said that he thought the truck was going to stop because it slowed down temporarily, and that he let the street car continue into the intersection. He testified unequivocally, however, that he looked away and took his eyes off of the truck. He said he then looked again toward the direction of the truck and saw that it was coming on across into the street. He then said he put on the brakes and brought the street car to a stop within four or five feet east of the center of the intersection, and that the truck then of its own volition cut to the left in making a left turn and ran into the street car that was standing still. Plaintiff was knocked out of the truck and the truck pushed over him some four or five feet. The whole front and left front side of the street car was demolished. The point of impact was definitely placed slightly west of the center point of the intersection. The location of the street car and truck after the collision was definitely placed slightly east of the west line of the intersection, with the truck being at about a 45 deg. angle across the track. Plaintiff submits that the conflict and contradiction in his version of the collision, which was corroborated substantially by his witnesses, and the street car operator's version, which was corroborated substantially by his witnesses, clearly raise a jury issue as to the

primary negligence of the defendant and the contributory negligence of plaintiff that 'discovered peril' was an issue for the jury."

The following authorities support our construction of the evidence on the issue of discovered peril: Dallas Ry. & Terminal Co. v. Redman, Tex.Civ.App., 113 S.W.2d 262; El Paso Electric R. Co. v. Davidson, Tex.Civ.App., 162 S.W. 937; Galveston Electric Co. v. Antonini, Tex.Civ.App., 152 S.W. 841; Texas Electric Ry. Co. v. Texas Employers' Ins. Ass'n, Tex.Civ.App., 9 S.W.2d 185; 39 Tex.Jur. 465-7.

The issue of discovered peril was seriously considered by the jury; on the first ballot the jury stood eight to four in favor of appellant, but after the judge sent his bailiff into the jury room, the issue was answered against appellant.

Appellee offered testimony that immediately after the accident the operator of another of appellee's street cars made the statement to the operator of the street car in the accident, "Well, boy, you tore up a good street car." Appellant's tender of this testimony as a part of the res gestae was correctly excluded by the court. It had no probative force whatever on any issue submitted to the jury.

The other errors assigned need not occur on another trial.

For the error discussed, the judgment of the lower court is reversed and the cause remanded.

Reversed and remanded.